IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 17, 2015

STATE OF TENNESSEE v. CHRISTOPHER BAILEY

Appeal from the Criminal Court for Shelby County
No. 1205561    Paula L. Skahan, Judge

_____

No. W2014-02434-CCA-R3-CD  -  Filed April 08, 2016

_____

The defendant, Christopher Bailey, was convicted of one count of rape of a child, a Class A felony.  On appeal, he argues that the evidence was insufficient to sustain his conviction; that the trial court erred by admitting evidence of uncharged sexual conduct; that the trial court erred by preventing him from impeaching a witness with evidence of the witness's prior convictions; and that the trial court erred by excluding evidence of the victim's prior sexual abuse.  Following our thorough review, we affirm the judgment of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., J., joined. ROGER A. PAGE, SP. J., not participating.

Stephen C. Bush, District Public Defender; and Harry E. Sayle, III, (on appeal) and Jennifer H. Case (at trial), Assistant District Public Defenders for the Appellant, Christopher Bailey.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katie Ratton and Cavett Ostner, Assistant District Attorneys General, for the Appellee, State of Tennessee.

OPINION

**FACTS AND PROCEDURAL HISTORY**

This case arose after the defendant sexually assaulted the victim when she spent the night at his home. At trial, the victim testified that she was born in 2000 and that she was fourteen years old at the time of the trial. For the first years of her life, the victim lived with her biological mother, her four sisters, five brothers, and four cousins. The victim initially testified that she did not live with her cousins, but she changed her testimony after being shown a transcript from a pretrial hearing where she said she lived with her four cousins. She testified that some of the children were teenagers when she lived with them.

Beginning in 2008, the victim lived with her biological father and her stepmother. Her stepmother had a daughter, the victim's stepsister, who was in a romantic relationship with the defendant. In December 2009, when the victim was nine years old, her stepsister and the defendant moved into a townhome together. The victim's stepsister had two children, who were the victim's niece and nephew, and the victim shared a close relationship with the children. The victim typically spent the night at her stepsister's home every other weekend. The townhome had two bedrooms upstairs, and the victim's stepsister and the defendant shared one bedroom and the victim's niece and nephew shared bunk beds in the second bedroom. The victim occasionally slept in the bunk bed with her niece, but she typically slept on the couch because the defendant instructed her to sleep there.

One evening shortly after the victim's stepsister and the defendant moved into the townhome, the victim was spending the night at the residence. She testified that while everyone else in the home was asleep, the defendant came downstairs while she was sleeping on the couch. The defendant went to get a glass of water and then walked over to the couch. He unzipped his pants and placed the victim's hands on his "stuff," which the victim explained meant his penis. While holding the victim's hands, he rubbed her hands "up and down" on his penis. He threatened the victim and told her not to tell anyone about the incident, which frightened her. The victim did not tell anyone about the incident at the time, and she continued to spend the night with the defendant and her stepsister on the weekends.

Sometime after the first sexual incident, the victim was again sleeping on the couch when the defendant came downstairs and woke her. The defendant unzipped his pants, made the victim open her mouth, and placed his penis in her mouth. He "moved" his penis "[u]p and down," and the victim said that the incident ended when a "white" substance "came out of [the defendant's] stuff." The victim described the substance as "[w]arm" and "[s]ticky." The defendant then exited the house and returned after purchasing some candy for the victim. The victim believed that she was eleven years old

2

at the time of the incident. She recalled that the defendant put his penis into her mouth "[q]uite a few times."

In the spring of 2012, when the victim was eleven years old, the victim's niece had her birthday party at the victim's home. The victim was getting ready for the party at the townhome her stepsister shared with the defendant. While the victim was upstairs, the defendant "grabbed" her buttocks. This incident occurred a "[l]ong time" after any of the incidents when the defendant put his penis in the victim's mouth. The victim told her nephew to tell her stepsister that the defendant had touched her buttocks. The victim did not want to tell her stepsister herself because she was afraid. The victim's nephew informed the victim's stepsister about the touching, and the victim's stepsister asked the victim in front of the defendant if he had touched her buttocks. The victim denied that the defendant touched her because he was in the room when her stepsister asked her about the incident. The victim's stepsister then asked the defendant if he touched the victim, and he replied that he did not. The victim testified that later that day she told her stepsister about how the defendant forced her to touch his penis and put his penis in her mouth, but her stepsister testified that she did not recall the victim saying these things.

At the birthday party, the defendant approached the victim while she was standing alone on the back porch and initiated a conversation. He said that he was "sorry," but he did not specify why he was apologizing. The victim's father saw the defendant talking to the victim, and he instructed the victim to go play in the yard with the other children. The victim's father noticed that the victim was the only child not playing and that while the other children seemed excited about the party activities, the victim was not "quite into it."

Two days after the party, the victim's stepmother was combing the victim's hair. The victim said that she had a secret to tell her stepmother but that she was afraid to disclose it. The victim's stepmother convinced the victim to tell her what was wrong, and the victim told her that the defendant "was doing bad things to her" and described the acts of abuse. She said she finally told her stepmother because she did not want the defendant to abuse her or her niece. She told her stepmother that the defendant had threatened to hurt her if she told anyone about the abuse.

The victim's stepmother told the victim's father about the victim's disclosure, and the victim's stepmother asked that the family go to the defendant's apartment. The victim's stepmother testified that she called police while on her way to the apartment and called again once she arrived. When the family arrived at the defendant's apartment, the victim's stepmother summoned the defendant downstairs into the living room. She asked the defendant if the victim's allegations were true, and he responded, "[N]o." She said that her son, the victim's stepbrother, arrived about two to three minutes after her, the

victim's father, and the victim. She stated that she, the victim's father, and the victim's stepbrother "constantly asked" the defendant about the allegations. She testified that the defendant repeatedly denied sexually abusing the victim. The victim's stepmother saw the defendant move toward the door, and the victim's stepbrother grabbed a baseball bat that was next to the front door. The victim's father and stepbrother wrestled the defendant to the ground and continued to ask the defendant if he did "anything." The victim's stepmother testified that the defendant then responded, "[Y]eah, I did it" but that the defendant then "changed it and said that he didn't do it." The victim's stepmother testified that the victim's stepbrother did not hit the defendant with a baseball bat or with a vacuum cleaner. She stated that the victim's father and stepbrother restrained the defendant until police arrived.

The victim's father testified that he called the victim's stepbrother on the way to the defendant's home. The victim's father said that he knocked on the defendant's door, went inside, and questioned the defendant about the victim's allegations. The victim's father testified that the victim's stepbrother arrived at the residence shortly after he did and that the family continued to question the defendant. The victim's father testified that the defendant repeatedly said "that nothing has happened." The victim's father saw the defendant walk next to a wall in the residence where the defendant kept a baseball bat and a weight. The defendant broke for the door, and the victim's stepbrother grabbed the baseball bat while the victim's father tackled the defendant. Once on the ground, the defendant said, "I'm sorry, man. I'm sorry." The victim's father testified that the victim's stepbrother asked the defendant why he was sorry. The victim's father testified that the defendant "never did say what he was sorry for, but he [said] he was sorry." The victim's father testified that he and the victim's stepbrother held the defendant on the ground and released him once police arrived. He said that the victim's stepbrother did not hit the defendant with the baseball bat.

The victim's stepbrother testified that the victim's stepmother called him, and after receiving the phone call, he met the family at the defendant's apartment. When he entered the residence, the defendant was coming down the stairs. The victim's stepbrother testified that the victim's father was questioning the defendant and that the defendant "had admitted to what he had d[one] and he was apologizing." The victim's stepbrother stated that the family continued to question the defendant, and the defendant "had admitted it the second time." After the second admission, the defendant "tried to charge" the victim's stepbrother, and the two began "scuffling." The victim's stepbrother believed that the defendant was going to reach for the baseball bat, so he grabbed the bat to prevent the defendant from using it as a weapon. The victim's stepbrother pointed the baseball bat at the defendant, and the victim's father restrained the defendant on the floor until police arrived. The victim's stepbrother testified that he did not hit the defendant

4

with the baseball bat. He also testified that the defendant never denied sexually abusing the victim.

The victim's stepsister testified that she answered the door and let the victim's stepmother, the victim's father, the victim's stepbrother, and the victim into her home on the evening of the confrontation. She stated that the family asked her to summon the defendant downstairs, and she testified that she called him to come downstairs. As the defendant was descending the stairs, the victim's stepsister heard her family asking him whether he sexually abused the victim. The victim's stepsister testified that the defendant looked at her and said he was sorry, although he did not say why he was apologizing.

Officer Verdo Jackson of the Memphis Police Department ("MPD") and his partner, Officer Steve Moore, responded to a 9-1-1 call from the victim's stepsister's apartment. When they arrived at the apartment, a female opened the door and told officers that there was "a rapist" in the apartment. Officer Jackson saw the victim's stepbrother holding a bat, and Officer Jackson drew his weapon and ordered him to drop the bat. The victim's stepbrother complied and said, "[I]t's not me, it's him," pointing to the defendant, who was lying on the living room floor. Officer Jackson recalled that "two or three people" were gathered around the defendant. Officer Jackson testified that the defendant's shirt may have been torn, but he did not see any blood or marks on the defendant's face. Officers escorted the defendant out of the apartment, and Officer Moore took statements from the victim's father and stepmother.

Lieutenant Carl Ray also responded to the scene. He stated that the victim "made a disclosure that she was sexually abused." After the disclosure, Lieutenant Ray arranged for the victim to participate in a forensic interview the next day. Lieutenant Ray observed the forensic interview, and he heard the victim make several more disclosures of sexual abuse.

On cross-examination, the victim agreed that in her forensic interview she said that the defendant put his penis in her mouth "every night." She agreed that she testified that this happened "three times" during direct examination, and she said that she picked the number three because she could not recall how many times the defendant actually put his penis in her mouth. She agreed that she did not tell the forensic interviewer about the incidents when the defendant placed her hands on his penis or when he grabbed her buttocks. The victim agreed that she told the forensic interviewer that her stepbrother struck the defendant with a baseball bat and a vacuum cleaner, but she testified that he did not actually strike the defendant with either object. She explained that she made this statement because she saw her stepbrother pick up a bat and a vacuum cleaner and she thought that he hit the defendant with these objects.

5

Danielle Williams testified for the defense. She stated that the defendant was her older brother and that he helped her mother raise her and her siblings. Ms. Williams testified that she visited the defendant at the home he shared with the victim's stepsister. She testified that in her opinion, the defendant was a truthful, kind, and unselfish person who was morally responsible.

At the conclusion of the proof, the jury convicted the defendant as charged. He filed a timely motion for a new trial, which the trial court denied. We now consider his claims on appeal.

## ANALYSIS

On appeal, the defendant argues that the evidence was insufficient to sustain his conviction; that the trial court erred by permitting the State to introduce evidence of the defendant's prior bad acts; that the trial court erred in denying his motion to impeach the victim's father with his prior convictions; and that the trial court erred in preventing him from questioning the victim about her prior sexual abuse pursuant to Tennessee Rule of Evidence 412.

### I. Sufficiency of the Evidence

The defendant argues that the evidence was not sufficient to find him guilty of rape of a child. He contends that the only evidence of sexual penetration was the testimony of the victim, who he claims was not a credible witness. The State responds that the evidence is sufficient.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v.*

*Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by the victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2010). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

Viewing the evidence in the light most favorable to the State, the victim frequently spent the night at the defendant's home, where he instructed her to sleep on the couch. The victim testified that on an occasion when she was eleven years old, she was sleeping on the couch when the defendant woke her up and placed his penis into her mouth. She testified that the defendant moved his penis around until it emitted a white substance that was warm and sticky. "[I]t has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013); *State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994), *overruled on other grounds by Collier*, 411 S.W.3d at 899-900. The victim was thoroughly cross-examined, and her credibility was made an issue for the jury. After hearing all of the proof, the jury found the victim's testimony credible, and any inaccuracies or inconsistencies in her testimony were not "'so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" *State v. Elkins*, 102 S.W.3d 578, 583 (Tenn. 2003) (quoting *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). We conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty of rape of a child.

## II. Tennessee Rule of Evidence 404(b)

The defendant argues that the trial court erred in admitting evidence of two uncharged acts of sexual abuse by the defendant against the victim. He contends that proof of the prior bad acts was not clear and convincing and that "intent is just propensity by another name." The State responds that the trial court properly admitted the evidence.

Prior to trial, the State made a motion to introduce evidence of the instances when the defendant woke the victim and placed her hand on his penis and when he grabbed her buttocks before her niece's birthday party. The State argued that the first incident marked the beginning of the defendant's sexual abuse of the victim and that the second

7

incident was the last incident of abuse and prompted the victim to make her disclosure. The State also argued that the proof would show the defendant's "intent, motive, and lack of mistake or accident in sexually abusing" the victim.

At a hearing, the victim testified that the defendant and her stepsister were in a romantic relationship and lived together, along with the victim's stepsister's two children. She testified that she did not remember when her stepsister and the defendant first moved into their home, but she stated that she was eleven years old at the time of the move. She agreed that it would "sound" correct if her stepsister said that she moved into the apartment in 2009, and the victim said that she would have been nine years old in 2009. The victim would sometimes spend the night at the defendant's apartment, and she slept downstairs on a couch. One evening, the defendant came downstairs while the victim was asleep on the couch. The defendant approached the couch, unzipped his pants, and placed the victim's hands on his penis. The defendant rubbed the victim's hands "up and down" his penis, and the victim testified that the incident lasted "[a] long, long time." After a period of time, the defendant returned to his bedroom. The victim returned to the couch, and she was afraid because the defendant instructed her not to tell anyone about the incident.

The victim testified that on April 28, 2012, she was at her stepsister's and the defendant's home getting ready for her niece's birthday party. When she walked past the defendant to go downstairs, he "grabbed" her buttocks. The victim testified that after the incident, she did not "want it to happen again." She told her nephew about the incident, and he in turn told the victim's stepsister. While the victim was in the room with the defendant, the victim's stepsister asked her if the defendant had grabbed her buttocks. The victim denied that the touching occurred because the defendant was in the room. She testified that she later told her stepsister that the defendant had grabbed her buttocks, in addition to revealing that the defendant "put his stuff in [the victim's] mouth" and "had made [her] grab his stuff." The victim stated that her stepsister "[g]ot on" the defendant about his behavior. At the party, the victim was standing alone on the back porch when the defendant approached her and said that "[h]e was sorry." The conversation ended when the victim's father instructed the victim to go play with the other children at the party. The victim testified that she did not recall omitting the grabbing incident from her forensic interview.

On cross-examination, the victim testified that she remembered telling the forensic interviewer about an incident when she was on the couch with her niece, nephew, and the defendant, and the defendant placed a blanket over the children and placed the victim's hand on his penis. She did not recall telling the forensic interviewer that this was the first time that the defendant touched her. She also did not recall stating that the defendant touched her on the buttocks after they watched a movie in the victim's stepsister's and

8

the defendant's bedroom. She remembered watching the movie, and she testified that the defendant did not touch her buttocks after the movie.

The trial court found that the victim's testimony provided clear and convincing proof that both acts of abuse occurred. The court found "that the material issue is the intent to commit a sexual assault on" the victim. In regards to the second incident, the court found "that the material issue is lack of mistake in what occurred and intent as well as guilty knowledge on the part of [the defendant] as to his behavior." The court acknowledged that the evidence was "extremely prejudicial." The court stated:

> As far as [the defendant] coming down when [the victim is] on the couch and the butt grabbing, those are I guess sexual batteries at the very least. Aggravated sexual batteries due to the age of the victim. I think what has to be considered here is the age of the victim. And that, in that a lot of the jury questioning was about children and whether they can be believed or not believed and everybody talked about how, how much children can fabricate, and they can. But I think in this situation that the probative value [of the evidence] is not outweighed by the danger of unfair prejudice[,] and I'm going to allow the testimony by [the victim].

Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." This rule is one of exclusion, in place to ensure that a jury does not improperly convict a defendant based upon "his or her bad character or apparent propensity or disposition to commit a crime," rather than on the strength of the evidence presented at trial. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). However, such evidence may be admissible for other purposes, which include "issues such as identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake." Tenn. R. Evid. 404(b) Advisory Comm'n Cmt. In order to admit evidence of a prior bad act:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed
by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

Unless the trial court failed to substantially comply with the procedural requirements of Rule 404(b), this court reviews a trial court's evidentiary ruling regarding 404(b) under an abuse of discretion standard. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). Here, the trial court substantially complied with the requirements of 404(b), and we review the ruling for an abuse of discretion.

In *Rickman*, our supreme court rejected "a general sex crimes exception" that would permit the admission of evidence "for the purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." *Rickman*, 876 S.W.2d at 828. The court noted that "[t]he general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Id.* As a result, the court concluded that "the general rule, which excludes evidence of other crimes or bad acts as irrelevant and prejudicial when the defendant is on trial for a crime or act of the same character, remains sound." *Id.* at 829. The court acknowledged, however, a narrow exception "admitting evidence of other sex crimes when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." *Id.*[1]

Initially, we conclude that the trial court abused its discretion in finding that a lack of mistake and the defendant's guilty knowledge as to his behavior were material issues regarding the grabbing incident. Evidence of a defendant's character may be admissible in the context of a lack of mistake or accident, but only to rebut such a claim after the defendant has raised it as a defense. *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Here, the defendant did not raise either of these defenses, making the evidence inadmissible on this basis.

For both incidents, the trial court also found that the evidence was probative of the defendant's intent. However, a finding that the evidence would be probative of intent then begs the conclusion that the defendant had the intent to commit the crime of rape of a child because he sexually abused the victim on other occasions. In such an instance, the

---

[1] The State did not argue at trial or on appeal that the evidence was admissible pursuant to the *Rickman* exception, and we note that this is not a case where the exception applies.

evidence would be little more than propensity evidence. *See* W. Mark Ward, *Tennessee Criminal Trial Practice § 22:24. Evidence−Proof of other crimes by defendant*, (2015-2016 ed.) ("The conclusion that a defendant had the specific intent to commit the crime charged on a specific day and time because he or she committed a similar crime on another day and time requires an inference that the defendant has the propensity to commit the crime on trial which is precisely what is condemned by the Rule.") (internal footnote omitted). While the evidence may have been admissible to explain why the victim delayed in reporting the abuse and to explain why she disclosed the abuse, the jury instructions reveal that the trial court only instructed the jury that they could consider the evidence as proof of the defendant's intent. Therefore, we conclude that the trial court abused its discretion in finding that the evidence was admissible to show the defendant's intent.

We must next determine whether the admission of this evidence was harmless error. In order to show that the error was not harmless, the defendant must "demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). Here, the evidence of the defendant's other bad acts comprised only a small portion of the victim's testimony, and the State did not emphasize the bad acts in its closing arguments. On cross-examination, the defense was able to use the evidence of the bad acts to impeach the victim by eliciting testimony that she had not disclosed the touching in her forensic interview. Further, the evidence of the first incident and the defendant's threats to the victim if she disclosed the incident were relevant to showing why the victim delayed disclosing the abuse, and the evidence of the grabbing incident was relevant to explain why the victim finally disclosed the abuse. *See State v. Rickey Bell*, No. W2014-00049-CCA-R3-CD, 2015 WL 846745, at \*13 (Tenn. Crim. App. Feb. 26, 2015) (concluding that evidence of defendant's prior sexual misconduct was admissible to explain why the victim waited five years to report the defendant's sexual abuse), *perm. app. denied* (Tenn. June 15, 2015). We conclude that the admission of the evidence was harmless, and the defendant is not entitled to any relief.

### III. Tennessee Rule of Evidence 609

The defendant argues that it was error for the trial court to prevent him from impeaching the victim's father with evidence of his prior convictions. He contends that the trial court applied an incorrect evidentiary standard in evaluating the convictions, which amounted to an abuse of discretion. The State responds that the trial court applied the correct standard and did not err in excluding evidence of the prior convictions.

Prior to the trial, the court held a hearing to determine if four of the victim's father's prior convictions would be admissible. Three of the convictions were for misdemeanor theft of property, and the fourth conviction was for the attempt to commit an unidentified felony. The defense admitted that it could not identify the specific attempted felony or any of the facts underlying the conviction. All of the convictions were over ten years old, as the victim's father was convicted of attempted felony in 1999 and of theft of property twice in 1997 and once in 1998. The defense argued that the convictions were necessary to challenge the victim's father's credibility because it believed that he was the only witness who would testify that the defendant admitted to sexually abusing the victim. The defense also argued that it was necessary to impeach the victim's father's credibility because he had a hostile demeanor when testifying. The State responded that the victim's father was going to testify that the defendant simply apologized, not that he made a specific admission, and that both the victim's stepsister and stepbrother would testify that the defendant apologized.

At the hearing, the victim's father testified that he arrived at the defendant's residence with his wife and the victim and confronted the defendant with the victim's allegations. Shortly after the victim's father arrived, the victim's stepbrother also arrived. The victim's father continued to ask the defendant what he did, and the defendant repeatedly asserted that he did "nothing." The victim's father eventually wrestled the defendant to the ground, and the defendant said, "I'm sorry. I'm sorry. I'm sorry, man." The victim's father testified that the victim's stepbrother asked the defendant why he was apologizing and that the defendant never gave a reason. The victim's father testified that the victim's stepmother, the victim, the victim's stepbrother, and the victim's stepsister and her children were all in the living room when the defendant said that he was sorry.

The trial court ruled that all of the victim's father's prior convictions were inadmissible. Because the convictions were more than ten years old, the trial court applied the test from Tennessee Rule of Evidence 609(b) and considered whether the probative value of the convictions substantially outweighed their undue prejudicial effect. The trial court noted that the facts underlying the felony conviction were unavailable. The court observed that the victim's father would testify only that he repeatedly asked the defendant what he did and that the defendant continually denied that he did anything before apologizing. The defendant never specified the reason for his apology, and the court observed that the victim's father was not going to testify that the defendant "gave a full confession with details." The trial court found that the probative value of the felony conviction did not substantially outweigh the undue prejudicial effect. In regards to the misdemeanor theft convictions, the court acknowledged that they were crimes of dishonesty but found that "in the interest of justice," the probative value of the convictions did not substantially outweigh their prejudicial effect.

12

The trial court possesses the sound discretion to determine whether to admit or exclude evidence. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). The evidentiary ruling of the trial court under Rule 609 will not be disturbed on appeal unless the trial court abused its discretion. *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Banks*, 271 S.W.3d at 116.

Tennessee Rule of Evidence 609 provides that a prior conviction may be used to impeach a witness, so long as certain requirements are met. "The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). If the witness to be impeached is the accused, the trial court "must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). If the witness to be impeached is not the accused, "the balancing test is different. Rule 403 applies, and a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice' or other criteria listed in that rule." Tenn. R. Evid. 609 Advisory Commission Comments (quoting Tenn. R. Evid. 403).

Ordinarily, evidence of the prior conviction is inadmissible "if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution." Tenn. R. Evid. 609(b). However, the evidence may be admissible if the proponent provides the adverse party with sufficient notice of the intent to use the evidence. *Id.* Additionally, the court must determine "in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *Id.*

The defendant argues that because the victim's father was not the accused, the trial court should have applied the balancing test in Rule 403 instead of the balancing test articulated in Rule 609(b). However, our supreme court recently stated that "[a] prior conviction more than ten years old may *never* be admitted *unless* the trial court determines 'in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect.'" *State v. Herron*, 461 S.W.3d 890, 906 (Tenn. 2015) (emphasis in original) (quoting Tenn. R. Evid. 609(b)). Thus, a court must apply the balancing test of 609(b) if the conviction is more than ten years old, even if the witness is someone other than the accused. As a result, we conclude that the trial court considered the issue under the proper analytical framework.

13

We conclude that the trial court did not abuse its discretion in excluding the evidence of the convictions. A period of more than ten years had elapsed since the convictions. At trial, the victim's father was not the only witness to testify about the defendant's apology, as the victim's stepmother and stepsister also testified that they heard the defendant apologize for an unspecified reason. Further, the defendant was able to attack the victim's father's credibility on cross-examination by exposing his bias against the defendant. The victim's father admitted on cross-examination that he told the defendant's investigator that he hoped the defendant would "rot in hell," and he also testified that he wished to see the defendant convicted of the charged crime. The defendant is not entitled to any relief.

## IV. Tennessee Rule of Evidence 412

The defendant argues that the trial court erred by preventing him from cross-examining the victim about a prior instance of sexual abuse. He contends that the prior incident was similar to the allegations against the defendant and that the incident explained the victim's knowledge of sexual matters, specifically fellatio. The State responds that the trial court properly excluded the evidence.

More than ten days prior to the trial, the defendant filed a motion pursuant to Tennessee Rule of Evidence 412 to admit evidence of the victim's prior sexual conduct. At a hearing, the victim testified that she was thirteen years old at the time of the hearing and that she lived with her father and her stepmother. She stated that when she was in second grade, she lived with her biological mother, her nine brothers, four sisters, and four cousins. By the time the victim was in third grade, she had been removed from her mother's home and was living with her father and stepmother because her mother's home was an unsafe environment for a child. The victim testified that before her removal, her two male cousins sexually abused her. The cousins placed their hands on the victim's front private part, and each cousin placed his penis in the victim's mouth on multiple different occasions. The victim testified that the penises did not move around in her mouth and that "white stuff" never came out of the penises. She testified that the instances of penetration would last only for a "[s]hort" period of time and that the incident where the defendant orally penetrated her lasted for a "[l]ong" time.

The trial court denied the defendant's Rule 412 motion. The court stated that "[t]he proper inquiry under Rule 412(c)(4)(ii) to determine admissibility here is whether the alleged victim demonstrates sexual knowledge beyond her age." The court found that the victim did "not demonstrate sexual knowledge beyond her years for either the prior specific instance of conduct" or the conduct with the defendant. The court stated that "[a] thirteen-year-old child is ordinarily aware of the particular acts constituting oral sex."

14

The court found that there was "no indication" from the victim's "unsophisticated terminology and description of both the penis and oral sex that any new terminology or sexual knowledge was gained as a result" of the prior conduct. The court determined that excluding the evidence would not create a risk that the jury would unduly credit the victim's testimony due to "a loss of sexual naivete." The court found that the only similarity between the prior abuse and the current allegation was that both instances involved oral penetration. The court noted that the prior incident was committed by the victim's blood relatives in her primary residence, while the defendant's conduct occurred when the victim was visiting her adult stepsister. The court also noted that the victim distinguished the duration of the assaults, identifying the first assault as "short" and the defendant's conduct as "long." Additionally, the court observed that the prior conduct did not involve ejaculation.

The court found that "[t]he prior conduct is not substantially similar to the alleged conduct that it would instill any detailed sexual knowledge" to the victim that the jury would falsely attribute to the defendant. The court observed that the testimony would only be relevant to either show that the victim's testimony was false "or for an inadmissible propensity purpose." The court noted that there was no allegation that the victim fabricated the prior allegations and that the defendant relied on the truth of the allegations to support his motion. The court found that the probative value of the evidence was "low" and that the exclusion would not cause the defendant unfair prejudice. The court noted that the danger of unfair prejudice against the victim substantially outweighed any probative value of the testimony.

Tennessee Rule of Evidence 412 provides that specific instances of a victim's sexual behavior with persons other than the accused may be admissible "to provide or explain the source of . . . knowledge of sexual matters." Tenn. R. Evid. 412(c)(4)(ii). This provision "will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity." Tenn. R. Evid. 412, Advisory Comm'n Cmts. "To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties." *Id.* The defendant must file a written motion at least ten days before the trial is scheduled to begin, and if the motion is properly filed, the trial court must hold a hearing. Tenn. R. Evid. 412(d)(1)(i), (2). If the court determines that the evidence is relevant to the issue of knowledge of sexual matters and "that the probative value of the evidence outweighs its unfair prejudice to the victim," the evidence may be admitted. Tenn. R. Evid. 412(d)(4). The purpose of this rule is to strike "a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412, Advisory Comm'n Cmts.

The trial court possesses the sound discretion to determine whether to admit or exclude evidence, and the evidentiary ruling of the trial court will not be disturbed absent an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). A trial court has abused its discretion only when it has "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.*

We conclude that the trial court did not abuse its discretion. The trial court properly applied the procedures in Rule 412 in considering whether the evidence was admissible. The victim was eleven years old when she disclosed the abuse, and she was thirteen years old at the time of the jury-out hearing. The victim's testimony regarding the defendant's actions was simple and straightforward, and it was not illogical for the trial court to conclude that she did not display a knowledge of sexual matters that was uncommon for a person her age. Further, as stated by the trial court, there were several distinctions between the two incidents, the most notable being that the prior abuse did not involve ejaculation and lasted only a "short" period of time. The trial court properly admitted the evidence, and the defendant is not entitled to any relief.

## CONCLUSION

Based upon the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

16